UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:19-CV-82-TBR

LAMONT DOZIER                                                                 PLAINTIFF

v.

DOUGLAS AUTOTECH CORPORATION                                    DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on two motions. First, Defendant Douglas Autotech Corp. filed a Motion for Summary Judgment. [DN 33]. Plaintiff Lamont Dozier responded, [DN 37], and Defendant replied, [DN 38]. Second, Plaintiff filed a Motion for Partial Summary Judgment on the issue of Defendant's liability for racial discrimination by applying a facially neutral policy in a manner which caused a disparate impact on African Americans. [DN 34]. Defendant responded, [DN 36], and Plaintiff replied, [DN 39]. Fully briefed, these matters are ripe for adjudication. For the reasons stated herein, Defendant's Motion for Summary Judgment, [DN 33], is **GRANTED**; and Plaintiff's Motion for Partial Summary Judgment, [DN 34], is **DENIED**. The Court will enter an Order and Judgment contemporaneous to this Memorandum Opinion.

## BACKGROUND

Plaintiff Lamont Dozier brings this lawsuit against Douglas Autotech Corporation (hereinafter "Defendant" or "DAC"). Plaintiff's remaining claims are for race discrimination under the Kentucky Civil Rights Act, tortious interference with business relations, and tortious interference with contractual relations. [DN 1; DN 16]. Defendant operates a manufacturing

facility in Hopkinsville, Kentucky. [DN 1]. On November 2, 2017, Plaintiff applied to work at Defendant's facility. *Id.* Defendant's application form requests information regarding convictions "of any crime other than a routine traffic offense;" and contains the following instruction:

> You should understand that any omission of relevant information, any false or misleading statement, or any failure to disclose facts which, if known, might reflect unfavorably on this application, may result in dismissal even if you are employed.

[DN 33-4 DAC Application Form at 1, ¶ 1, 5]. Then, at the end of the form, the applicant must sign a certification and agreement, which includes the following term of employment:

> Certification of Truthfulness: I represent that all my statements in support of my Application for Employment are true and complete. I understand and agree that if, at any time, EMPLOYER should determine that any requested or relevant information was withheld by me or any of my statements are false and misleading, I may be discharged.

[*Id.* at 6, ¶ 1]. Following application submission and a favorable interview, the next step in the hiring process is the conditional offer letter. [DN 33-1 at 3].

On November 7, 2017, Plaintiff was interviewed, and Defendant made Plaintiff a contingent offer of employment as a Second-Shift Team Leader. Defendant's intention was conveyed to Plaintiff through a November 7, 2017 letter of contingent offer. [*See* DN 33-5]. This letter stated that an offer of employment "is contingent upon the completion of a satisfactory background check." *Id.* at 2. Before Plaintiff reported to for work, Defendant ran a background check and discovered that Plaintiff had not disclosed a 1999 conviction for fourth degree assault. [DN 1 at 3]. Subsequently, on November 10, 2017, Plaintiff was contacted by telephone by Defendant's Human Resources representative who informed Plaintiff that Defendant had rescinded Plaintiff's job offer based on his failure to disclose the 1999 conviction. [DN 33-1; DN 34]. Although Plaintiff informed Defendant that he had forgotten to list the conviction, the job offer was not reinstated. [DN 1 at 4]. Plaintiff's offer was rescinded prior to the initiation of his

employment duties with Defendant due to a failure to disclose a criminal conviction on his application. [DN 34].

Defendant's "failure to disclose" policy dictates that should an employee fail to disclose a criminal conviction on his or her application that then appears on their background check, the employee will be rendered ineligible for hire for a period of six months. [DN 33-3 Deposition of Taren Hall at 74:14-25]. Defendant declares that due to the nature and risks of the manufacturing process, it maintains a "higher than normal expectation of honesty and integrity" for the employees which it retains. [*Id.* at 50:14-15]. Defendant uses its "failure to disclose" policy as a tool to measure the honesty and integrity of its potential employees before they are hired. [*Id.* at 24:6-9]. Here, in failing to disclose his 1999 conviction on his application, Plaintiff's contingent offer of employment was rescinded pursuant to this policy.

In December 2017, Plaintiff obtained a job with Gem Quality as a "quality inspector tech." [DN 33-16 at 22:16-24]. Gem Quality's primary business was third-party quality inspection— which included third-party inspection of components manufactured at Defendant's "Automotive and Light Truck" manufacturing plant. Gem Quality assigned Plaintiff to work in Defendant's facility. [DN 34 at 13]. Defendant had a policy of requesting that its contractors (*i.e.*, Gem Quality) provide Defendant's human resources department with a list of names of employees it intends to send to work on Defendant's premises for determination of eligibility to work on-site. [DN 33-3 at 70:19-25]. The purpose of this process is to act as a safety precaution to keep individuals who left in unamicable fashion or were ineligible to be hired by Defendant from working on-premises. [*Id.* at 71:1-6]. This policy was not in writing. *Id.* at 70–71. Gem Quality sent Defendant a list of its potential employees, including Plaintiff, to work on-site at Defendant's facility. *Id.* at 72:25, 73:1-4. Defendant informed Gem Quality that Plaintiff was ineligible to work at its facility. *Id.*

Because Plaintiff could not work for Gem Quality on Defendant's premises, the only other available option that Gem Quality could provide Plaintiff was a jobsite located twenty minutes past Murfreesboro—which was around an hour and a half drive from Plaintiff's home. [DN 33-16 at 75:18-25, 76:1-7]. This did not work for Plaintiff, therefore his employment contract with Gem Quality was terminated.

Plaintiff claims that Defendant violated Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act ("KCRA") by rescinding his contingent job offer based on his race and employing a facially neutral "failure to disclose" policy that has a disparate impact on African American job offer recipients. [DN 1]. Plaintiff further claims that Defendant tortiously interfered with Plaintiff's business relationship and contractual relationship with Gem Quality. [DN 1]. On June 10, 2019, Plaintiff filed the current action alleging race discrimination under Title VII of the Civil Rights Act, race discrimination under the Kentucky Civil Rights Act, tortious interference with business relations, and tortious interference with contractual relations. [DN 1]. The Court previously dismissed Plaintiff's claim of race discrimination pursuant to Title VII of the Civil Rights Act of 1964 as untimely. Now, Defendant moves for summary judgment on Plaintiff's three remaining state law claims and Plaintiff moves for summary judgment on his disparate impact claim.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court "may not make credibility determinations nor weigh the evidence when

determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Althers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to overcome summary judgment. *Id.* The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied that burden, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *Anderson*, 477 U.S. at 250. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including the discovery and disclosure materials on file, and any affidavits or declarations. Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

Plaintiff argues Defendant's policy disproportionately affects African Americans and by applying this policy, Defendant engaged in racial discrimination as prohibited under the Kentucky Civil Rights Act, KRS § 344.010 *et seq.* [DN 34]. Both parties have moved for summary judgment

on Plaintiff's disparate impact claim.  Defendant also moves for summary judgment on Plaintiff's disparate treatment claim and claims for tortious interference.

## I. Race Discrimination under the Kentucky Civil Rights Act

The Kentucky Civil Rights Act provides that "[i]t is an unlawful practice for an employer . . . to refuse to hire . . . or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race . . ." Ky. Rev. Stat. § 344.040(1)(a).  Claims brought under the Kentucky Civil Rights Act and Title VII are analyzed using the same framework. *Jefferson County v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1250 (6th Cir. 1995) (explaining that because the KCRA is specifically modeled after Title VII, to state a claim thereunder "a plaintiff must prove the same elements as required for a prima facie case of discrimination under Title VII"). Therefore, the Court will rely on Title VII case law to evaluate Plaintiff's claims.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. "Title VII prohibits both intentional discrimination (known as "disparate treatment") as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as "disparate impact")." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

### A. Disparate Treatment

In the instant case, Plaintiff alleges that he was treated differently than non-African American employees of Defendant based on his race, and his job offer was rescinded based on his race. [DN 1 at 10].

Disparate treatment occurs "where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." *Ricci*, 557 U.S. at 577 (quoting *Watson v. Fort*

*Worth Bank & Trust*, 487 U.S. 977, 985–86 (1988)). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Id*. In a disparate treatment case, "the plaintiff must establish that the adverse employment action was motivated, in part, by the plaintiff's protected-group status." *Lewis-Smith v. W. Kentucky Univ.*, 85 F. Supp. 3d 885, 897 (W.D. Ky. 2015), aff'd (Jan. 12, 2016) (McKinley, J.).

Here, Plaintiff has offered no "direct evidence" that his job offer was rescinded because of his race.  Absent "direct evidence" of discrimination, a plaintiff may still proceed with a federal discrimination claim by raising the inference of discrimination with circumstantial evidence through the *McDonnell Douglas* "burden shifting" approach. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

Under *McDonnell Douglas*, a plaintiff states a prima facie case of discrimination under Title VII in failure to hire cases where he establishes (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the job; and (4) he was treated differently than similarly situated non-minority employees for the same or similar conduct. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Once the plaintiff proves his prima facie case, the burden shifts to the employer to "articulate some legitimate non-discriminatory reason" for the employment action. *West v. Wright Constr. Co.*, 756 F.2d 31, 33 (6th Cir.1985). The employer need not persuade the court that it was actually motivated by the proffered reasons. *Id.* It is sufficient if the employer raises a genuine issue of fact as to whether it discriminated. "If the employer meets the burden of articulation, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason

proffered by the employer was not its true reason but merely pretext for discrimination." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir.1994).

The first two elements of Plaintiff's prima facie case are not in dispute. Regarding the third element, Defendant concedes that Plaintiff possessed the technical qualifications for his offered position with DAC. [DN 33-1 at 14]. However, Defendant argues that Plaintiff was not qualified for the job in light of the "higher than normal expectations of honesty and integrity" held by Defendant regarding the hiring of its employees. [*Id.* at 13]. Defendant's corporate representative testified that DAC maintains this expectation due to the sensitive nature of the automotive components that are manufactured on-premises. [DN 33-3 at 50:15-21]. Defendant's full disclosure policy is meant to act as an indicator of a candidate's honesty. Therefore, because Plaintiff "failed to list certain criminal convictions on his application, after numerous written and oral warnings to do so in order to be eligible for employment, DAC made the necessary decision to rescind his offer per practiced policy." [DN 33-1 at 14]. Defendant has presented affirmative evidence that honesty and integrity are essential for a potential employee to be qualified for a position at DAC; and Defendant uses its disclosure policy as a tool to gauge the honesty and integrity of its job offer recipients. Moreover, it has been established that Plaintiff's job offer was rescinded because of his failure to disclose a prior conviction, therefore Plaintiff was deemed unqualified for a position at DAC.

Further, Defendant denies that Plaintiff was treated differently than similarly situated non-minority employees for the same or similar conduct. [*Id.*] As noted by Defendant, the record does not show and Plaintiff has not presented any evidence of a Caucasian employee who failed to disclose prior criminal convictions, but whose offer was not then rescinded. [DN 33-1 at 14]. In fact, during the fiscal year Plaintiff's contingent offer was rescinded, FY 2017, two of the six job

candidates who had offers rescinded for failure to disclose convictions were White and four were African American. [DN 33-12]. Moreover, data reveals that from 2017–2020, Defendant extended contingent offers to 208 African American applicants and (coincidentally) 208 Caucasian applicants. [DN 34 at 11; DN 34-5]. Subsequently, 46 African Americans had their offers rescinded due to the policy at issue and 36 Caucasians had their offers rescinded due to the policy at issue. [DN 34 at 11; DN 34-5]. Upon review, the Court finds that Defendant has presented affirmative evidence showing Plaintiff was treated the same as similarly situated non-minority employees who also failed to disclose a prior conviction. Defendant applied its failure to disclose policy equally to every job offer recipient regardless of his or her race. Both African American and Caucasian job offer recipients had their contingent offers rescinded when they failed to disclose a prior conviction. The fact that there were more African American applicants who failed to disclose a prior conviction than White applicants is not the result of Defendant's policy; and is not evidence of disparate treatment.

Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of disparate treatment under Title VII as it pertains to the rescission of his contingent job offer. There is no genuine dispute of material fact and Defendant is entitled to summary judgment on this claim.

### B. Disparate Impact

Plaintiff alleges that Defendant employed a facially neutral "failure to disclose" policy that disproportionally affected African American job offer recipients.

"Disparate impact analysis is used when an employer's facially neutral policy adversely affects a protected class." *Bacon v. Honda of Am. Mfg., Inc*., 370 F.3d 565, 576 (6th Cir. 2004). The Supreme Court has devised a three-part burden-shifting test to determine whether an unlawful disparate impact exists in any particular case. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th

Cir. 2005) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). First, the plaintiff must establish a *prima facie* case of discrimination—*i.e.*, the plaintiff must establish that an adverse impact has occurred. *Id.* If the plaintiff succeeds, the employer must show that the protocol in question has "a manifest relationship to the employment"—the so-called "business justification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971). If the employer succeeds, the plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle*, 422 U.S. at 425, 432.

**1.) Did Plaintiff establish a prima facie case of discrimination?**

"To establish a *prima facie* disparate-impact case, a plaintiff must: (1) identify a specific employment practice; and (2) present data indicating that the specific practice had an adverse impact on a protected group." *Davis v. Cintas Corp.*, 717 F.3d 476, 494 (6th Cir. 2013). "[I]t is not enough to simply allege that there is a disparate impact on workers or point to a generalized policy." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).

Here, Plaintiff has identified a specific employment practice that is allegedly discriminatory—Defendant's facially neutral "failure to disclose policy" that Plaintiff alleges has a disparate impact on Defendant's African American job offer recipients (which includes Plaintiff). [DN 34]. Plaintiff has satisfied the first element of his *prima facie* disparate impact claim and this fact is not in dispute.

Next, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). A plaintiff can establish that a particular policy has an adverse impact by showing a statistically significant disproportionate effect on African Americans from the relevant data. *Howe*

*v. City of Akron*, 801 F.3d 718, 743 (6th Cir. 2015); *Isabel*, 404 F.3d at 410, 413. "Small or incomplete data sets and inadequate statistical techniques are insufficient to establish a plaintiffs prima facie case." *Austin v. Memphis Light, Gas & Water Div.*, 129 F.3d 1263 (6th Cir. 1997).

In this case, the parties utilize the same data sets produced by Defendant in their statistical analyses. Thus, there is no dispute regarding the data itself. However, the parties dispute the proper statistical method to use to determine whether Plaintiff has met his burden.  Neither the Supreme Court nor the Sixth Circuit has said what kind of statistical evidence courts must rely on to find adverse impact. *See Howe,* 801 F.3d at 743. In *Isabel*, the Sixth Circuit stated ". . . we require only that the statistical analyses be 'relevant.'. . . Also, the Supreme Court has approved the use of a case-by-case approach, recognizing that statistics "come in infinite variety and . . . their usefulness depends upon all of the surrounding facts and circumstances." *Isabel*, 404 F.3d at 411 (citing *Teamsters v. United States*, 431 U.S. 324, 339–40 (1977)). Therefore, the Court shall consider the statistical evidence offered by both parties to determine if there is a genuine dispute regarding whether Plaintiff has established his prima facie case under a disparate impact theory.

Defendant argues Plaintiff failed to establish a prima facie case because he did not utilize the Equal Employment Opportunity Commission's ("EEOC") "four-fifths" rule or other statistical models routinely weighed by federal courts. [DN 36 at 18]. Instead, Plaintiff used "unreliable" and "statistically illiterate" calculations, "with results untethered to the ultimate selection rates of racial applicant groups within the DAC hiring process." [*Id.* at 17–18]. Defendant contends the "four-fifths" rule is the primary statistical model utilized by courts as evidence of disparate impact. [*Id.* at 16]. Defendant further states the "four-fifths" rule illustrates a statistical lack of disparate impact in this case; therefore, Plaintiff has failed to present affirmative evidence of disparate impact and Defendant is entitled to summary judgment on this claim. [*Id.* at 18].

The "four-fifths" is enumerated in the EEOC's Uniform Guidelines, and specifically states:

Adverse impact and the "four-fifths rule." A selection rate for any race, sex, or ethnic group which is less than four-fifths ( 4/5 ) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R § 1607.4(D). The "selection rate" is defined as "the proportion of applicants or candidates who are hired, promoted, or otherwise selected." 29 C.F.R. § 1607.16(R).[1] The "four-fifths" rule is meant to measure the adverse impact of a hiring policy upon a protected class by measuring the proportional differences in selection rates between the protected class and the group with the highest rate of selection. [DN 36 at 9]. The resulting percentage—the "impact rate"—is the final measurement to establish disparate impact.[2] If the impact rate is more than 80%, then that is evidence that no disparate impact exists. [*Id.*] An impact rate that is less than 80% is evidence of disparate impact.[3] [*Id.*] Here, the impact rates for 2017–2020 ranged between 88.4% – 95.7%, with a cumulative impact rate of 94.2%, and an average impact rate of 92.6%. [DN 36; data from DN 34-4 Douglas Depo. Exhibit 14].

In contrast, Plaintiff challenges the reliability of the "four-fifths" rule and points to Sixth Circuit precedent and Guidance from the EEOC stating that the "four-fifths" rule is not dispositive and an employee may show a disparate impact even where the employer "passed" the "four-fifths" test. [DN 39 at 5]. Plaintiff argues that courts have "not limited a plaintiff's choices in Title VII cases involving statistical analysis in any way . . . [and] prefer to look to the sum of statistical

---

[1] The "selection rate" may be calculated by dividing the number of applicants hired by the number of total offers issued. Using the data provided in this case, the resulting percentage shows the statistical difference created by offers that were later rescinded due to the "failure to disclose" policy at issue. [SR = # hired / # total offers].

[2] The "impact rate" is calculated by dividing the selection rate for African American applicants by the selection rate for white applicants, then multiplying by 100 to get the final percentage. [IR = (SR (African American) / SR (White)) x 100].

[3] In *Ricci v. DeStefano*, 557 U.S. 557, 586, (2009), the Supreme Court indicated that a violation of the four-fifths rule was prima facie evidence of disparate-impact liability, citing 29 C.F.R. § 1607.4(D).

evidence to make a decision in these kinds of cases." *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162 (6th Cir. 1989).[4] Plaintiff relies on a statistical model that compares the percentage of persons in each racial group treated *adversely* by the policy at issue, rather than using the "four-fifths" rule's approach of comparing the percentages of persons treated *beneficially* by the policy at issue. Plaintiff's model is essentially the converse of the "four-fifths" rule. [DN 39at 8]. Plaintiff contends this methodology "is a statistical model which the EEOC's guidance relating to the "four-fifths" rule . . . establishes is a valid approach to showing disparate impact." [*Id.* at 7].

Using the same data as Defendant, Plaintiff began by calculating the percentage of African American applicants whose offers were rescinded due to Defendant's "failure to disclose" policy and the percentage of White applicants whose offers were rescinded due to the policy. [DN 39 at 7]. Then, Plaintiff measured the ultimate disparate impact on African American applicants by comparing (*i.e.* dividing) the percentage of African American applicants adversely affected by the policy to the percentage of White applicants adversely affected. [DN 34; DN 39 at 7, 9 n.1].

Pursuant to Plaintiff's analysis, in 2017 (the period in which Plaintiff's own job offer was rescinded), 20% (4 offers rescinded/20 total offers) of African American applicants had their offer rescinded due to Defendant's policy, whereas 9.52% (2 offers rescinded/21 total offers) of White applicants had their offers rescinded. [DN 34 at 9]. Thus, African American applicants were 110%

---

[4] The Court notes that even though Defendant used the "four-fifths" test as its sole model of statistical analysis, Defendant did not state that the "four-fifths" test is the only acceptable model to use as evidence of disparate impact as Plaintiff suggests. Defendant concedes there are other statistical models that produce reliable evidence besides the "four-fifths" rule, but Plaintiff's statistical analysis resulted in unreliable evidence. [DN 36 at 18]. Moreover, in *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005), the court states that "commentary to the Commission's regulations allows for exceptions to the four-fifths rule: 'Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin." 29 C.F.R. § 1607.4(D).

more likely to have their job offers rescinded due to the policy than White job offer recipients.[5] [*Id.*]

In 2018, 23.73% (14/59) of African American applicants and 20.29% (14/69) of White applicants had their offer rescinded. [*Id.*] Thus, African Americans were 16.95% more likely to have their job offers rescinded. [*Id.*] In 2019, 20.62% (20/98) of African American applicants and 16.85% (15/89) of White applicants had their offer rescinded. [*Id.* at 10]. Thus, African Americans were 22.34% more likely to have their job offers rescinded. [*Id.*]

In 2020, 25% (8/32) of African American applicants and 17.24% (5/29) of White applicants had their offer rescinded. [*Id.*] Thus, African Americans were 45% more likely to have their job offers rescinded. [*Id.*] Cumulatively, from 2017–2020, data reveals that 22.12% (46/208) of African American applicants and 17.31% (36/208) of White applicants had their offer rescinded due to the policy. [*Id.* at 11]. Thus, African Americans were 27.78% more likely to have their job offers rescinded. [*Id.*]

The Court finds that Plaintiff's method of analysis does not render it unreliable or irrelevant for the purpose of establishing a *prima facie* case at this stage of the litigation. The only questions at this point are whether there was an identifiable disparity and, if so, whether the challenged employment practice (*i.e.*, the failure to disclose policy) could have caused the disparity. Based on a rudimentary statistical analysis, the Court finds that even though the cumulative data over three years reveals that ten more African American job offer recipients had their offers rescinded due to the policy than White job offer recipients, this small number is not enough to prove that the policy

---

[5] *I.e.*, in 2017, African Americans were negatively affected by the policy at the same rate as White applicants *plus* an *additional* 110% impact—which Plaintiff represents as the "Disparate Impact on African Americans." Moreover, 20% is approximately 210% of 9.52%, and in order for the negative impact of the policy to have an equal impact on both African American and White applicants, 110% more White applicants' offers would need to be rescinded—*i.e.*, there needs to be 110% more offers rejected in order for 9.52% to equal 20%.

had a "*significant* adverse effect" on African American applicants. *See Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 486 (6th Cir. 2008); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000). The statistical evidence is not "of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Kovacevich*, 224 F.3d at 830.

Moreover, Defendant argues that Plaintiff has offered no evidence that the policy at issue creates a disparate impact upon the hiring of African Americans at DAC. [DN 36 at 20]. In fact, it is the individual's autonomous (and contemporaneous) act of nondisclosure that results in the adverse employment action, not the criminal conviction itself. Plaintiff has not offered affirmative evidence supporting the idea that the rates of conviction for a racial group are dispositive of whether that group is more likely to fail to disclose that information on an employment application.

Accordingly, as Plaintiff has not presented statistical evidence of a kind and degree sufficient to show that Defendant's failure to disclose policy caused African American applicants to be excluded from employment because of their membership in a protected class, the Court holds that Plaintiff has failed to establish a prima facie case of disparate impact under Title VII. Thus, summary judgment is appropriate in favor of Defendant.

### 2.) Business Justification

Assuming arguendo that Plaintiff established a prima facie case of disparate impact, the Court finds that Defendant has presented affirmative evidence that the policy in question has "a manifest relationship to the employment"—the so-called "business justification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).

Here, Defendant argues that it has a legitimate non-discriminatory reason for rescinding the offer of employment of job offerees who are found to have falsified or otherwise omitted

requested information on their applications for employment: "DAC maintains higher than normal expectations of honesty and integrity due to the importance of the manufacturing process they undertake." [DN 33-1 at 19; DN 33-3 at 50:15-21]. Defendant further emphasizes that the policy at issue "does not act to bar potential applicants based on prior criminal convictions they may have, but instead their ***contemporaneous failure*** to disclose prior criminal convictions to DAC." [DN 33-1 at 19]. It is Defendant's position that such omissions and failures to disclose are "a negative indicator towards the characteristics of integrity and honesty that it requires in its workforce." [*Id.*]

In response, Plaintiff relies on Guidance from the EEOC relating to the use of criminal background checks in hiring and when such use can constitute race discrimination. The Guidance provides that:

> To establish that a criminal conduct exclusion that has a disparate impact is job related and consistent with business necessity under Title VII, the employer needs to show that the policy operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position.

*See* Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act, U.S. EEOC. However, the factual scenario in the EEOC Guidance is distinguishable from the facts in this case. Here, the purpose of the policy is not to target a criminal conviction itself, but to reveal applicants who do not disclose a prior conviction.

The Court agrees with Defendant that the policy at issue is not a "criminal conduct exclusion" of the nature and type described in the Guidance from the EEOC. Thus, Plaintiff's argument trying to establish a linear connection between the policy at issue and the criminal conduct exclusion policies described by the EEOC fails. In this case, a job offer recipient will not have his or her job offer rescinded because of the criminal conviction on his or her record. Instead, pursuant to the policy at issue, a job offer will only be rescinded if an individual fails to disclose a

criminal conviction. It is the act of nondisclosure—which Defendant reasonably construes as an act of dishonesty—that results in the adverse employment action. Not the criminal conviction itself. Accordingly, the Court finds that Defendant has established that the policy at issue is job related and consistent with business necessity.

### 3.) Less discriminatory alternative

In his motion, Plaintiff proposes two alternative methods for screening for potential employees for "integrity" and "honesty." First, Plaintiff suggests that Defendant should utilize the information disclosed on applications regarding criminal convictions to identify applicants who have recently been convicted of theft and other crimes of dishonesty. [DN 34 at 22; DN 37 at 7]. Second, Plaintiff suggests that Defendant could impose a time limit on the "look back" period it uses to determine whether disclosed convictions on an application match those listed on the applicant's criminal record. [*Id.*]

While Plaintiff has presented reasonable alternatives to Defendant's current policy, this does not refute the fact that the Court found Defendant's current policy is not discriminatory in effect nor has Defendant employed it in a discriminatory manner. Ultimately, Plaintiff has not overcome the initial failure to establish a prima facie case of disparate impact. Therefore, Plaintiff's subsequent suggestion of alternative policies does nothing to revive his disparate impact claim. The current policy is not discriminatory, therefore there is no need to consider any alternative, regardless of how "reasonable" or "practical" it may be.

Based on the evidence of record, the Court finds that there is no genuine dispute of material fact and there is no disparate impact arising from Defendant's policy. Thus, Defendant is entitled to summary judgment on Plaintiff's disparate impact claim.

## II. Tortious Interference with Business Relations

Plaintiff claims that Defendant tortiously interfered with Plaintiff's "business relationship or expectancy of a business relationship with Gem Quality by telling Gem Quality that Plaintiff was not permitted on Defendant's premises." [DN 1 at 11].

In Kentucky, "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability for the pecuniary harm resulting from loss of the benefits of the relation. . ." *Henderson v. Skyview Satellite Networks, Inc.*, 474 F.Supp.3d 893, 908 (W.D. Ky. 2020); *Ventas, Inc. v. HCP, Inc*., 647 F.3d 291, 306 (6th Cir. 2011) (quoting Restatement (Second) of Torts § 766B (1979)). A claim for tortious interference with business relations requires proof of six elements: "(1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. App. 2014) (citing *Monumental Life Ins. Co. v. Nationwide Retirement Sols., Inc*., 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003)). In order to prevail under this theory of liability, "the party seeking recovery must show malice or some significantly wrongful conduct." *Snow Pallet, Inc. v. Monticello Banking Co*., 367 S.W.3d 1, 6 (Ky. Ct. App. 2012) (quoting *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky.1988)).

Here, Plaintiff has sufficiently pled, and Defendant conceded to the existence of a valid business relationship between Plaintiff and Gem Quality that Defendant was aware of by virtue of Gem Quality's e-mail correspondence requesting Plaintiff's admission onto Defendant's premises. [DN 33-1 at 23]. Beyond these elements, however, Plaintiff has not presented any evidence or raised a genuine issue of material fact with respect to the remaining four elements of his claim:

intentional interference, improper motive, causation, and special damages. [*Id.*] Instead, Plaintiff's primary argument is that because Defendant rescinded Plaintiff's job offer pursuant to a racially discriminatory policy, Defendant's subsequent act of refusing Plaintiff access to its facility to work for Gem Quality "solely because of [Plaintiff's] status as a victim of Defendant's policies is therefore improper, and constitutes interference with Plaintiff's business relationship with Gem Quality." [DN 37 at 8].

Defendant's representative testified that it was Defendant's policy to require that its contractors (*i.e.*, Gem Quality) provide Defendant's human resources department with a list of names of employees it intends to send to work on Defendant's premises for determination of eligibility to work on-site. [DN 33-3 at 70:19-25]. The purpose of this process is to act as a safety precaution to keep individuals who left in unamicable fashion or were ineligible to be hired by Defendant from working on-premises. [*Id.* at 71:1-6]. Pursuant to this policy, Plaintiff was prevented from accessing Defendant's facility due to his existing ineligibility to be hired at the facility. [DN 33-1 at 23]. Plaintiff testified that Defendant's refusal to permit Plaintiff to work for Gem Quality on Defendant's premises, did not exclude him from further work with Gem Quality. In fact, Plaintiff explained that at the time, the only other available option that Gem Quality could provide Plaintiff was a jobsite located twenty minutes past Murfreesboro—which was around an hour and a half drive from Plaintiff's home. [DN 33-16 at 75:18-25, 76:1-7]. This did not work for Plaintiff, and Gem Quality told him they would call him if anything else came available. [*Id.*] After a few weeks, Plaintiff had not received a call from Gem Quality and obtained employment with a different company. [*Id.* at 77].

Additionally, Defendant's presented testimony establishing a proper motive—ensuring the safety of DAC employees—and the Court finds that the record does not reveal any evidence of ill

will or unjustified purpose behind Defendant's policy. [DN 33-3 at 70:22-25, 71:1-6]. Defendant's actions in maintaining a policy and procedure to ensure the safety of its employees does not rise to the level of intent and purpose needed to establish a tortious interference claim. *See National Collegiate Athletic Assoc. v. Hornung*, 754 S.W.2d 855, 857–60 (Ky.1988) (noting that even if a party does show an intent to interfere that right may be overcome by showing the defendant had a good faith basis to protect its own contractually bargained for interests).

Based on the record and evidence presented, the Court concludes that Plaintiff has not pled sufficient facts or presented evidence establishing a genuine issue of material fact regarding whether Defendant wrongfully interfered with his business relationship with Gem Quality. Therefore, Defendant is entitled to summary judgment on Plaintiff's tortious interference with business relations claim.

## III. Tortious Interference with Contractual Relations

In his final claim, Plaintiff alleges Defendant tortiously interfered with his at-will employment contract between Plaintiff and Gem Quality. [DN 1 at 12]. A party alleging tortious interference with a contract must show the following six elements: "(1) the existence of a contract;" (2) the defendant's "knowledge of this contract;" (3) that the defendant "intended to cause its breach" of the contract; (4) causation; (5) that the breach at issue caused damages to the plaintiff; and (6) that the defendant "had no privilege or justification to excuse its conduct." *Ventas, Inc. v. Health Care Prop. Investors, Inc*., 635 F. Supp. 2d 612, 618-19 (W.D. Ky. 2009) (citing *Dennison v. Murray State Univ*., 465 F. Supp. 2d 733, 755 (W.D. Ky. 2006) ); *see also Snow Pallet, Inc. v. Monticello Banking Co*., 367 S.W.3d 1, 5–6 (Ky. Ct. App. 2012).

"'At a minimum, to be actionable,' a party claiming tortious interference with a contract 'must show that a contract existed between it and a third party followed by a breach by the third

party.'" *Griffin v. Jones*, 170 F. Supp. 3d 956, 968 (W.D. Ky. 2016) (quoting *CMI, Inc. v. Intoximeters, Inc*., 918 F. Supp. 1068, 1079 (W.D. Ky. 1995)). A critical element is that Plaintiff must show that Defendant caused Gem Quality to breach the employment contract. *See Ventas, Inc. v. Health Care Property Investors, Inc.*, 635 F.Supp.2d 612, 619 (W.D. Ky. 2009). Not only did Plaintiff testify that Defendant's actions did not directly cause his employment relationship with Gem Quality to end, Plaintiff also admitted that his contract with Gem Quality was at-will. [DN 33-16 at 75:18-25, 76:1-7; DN 1 at 12]. Pursuant to Restatement (Second) of Torts § 768 (1979), cmt. (i):

> If the third person is free to terminate his contractual relation with the plaintiff when he chooses . . . any interference with it that induces its termination is primarily an interference with the future relation between the parties . . . As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of the third person there is no breach of it. (emphasis added); Restatement (Second) of Torts § 768 (1979) (Explaining that a competitor "causing a breach of an existing contract" can constitute "an improper interference if the contract is not terminable at will.").

*ACT for Health v. United Energy Workers Healthcare Corp.*, 2018 WL 2090819 at *10 (W.D. Ky. May 4, 2018) (quoting Restatement (Second) of Torts § 768 (1979), cmt. (i)). Accordingly, though Plaintiff's contract with Gem Quality ended because he was not able to work at Defendant's facility and Gem Quality's other work sites were too far, the (seemingly mutual) termination of an at-will contract does not result in a breach or give rise to a tortious interference claim.

Moreover, as discussed previously, Defendant possessed proper motive when it denied Plaintiff access to its facility pursuant to its safety policy of keeping individuals who left in unamicable fashion or were ineligible to be hired by Defendant from working on-premises. It is clear from the record that Plaintiff has failed to present any evidence that his (at-will) employment contract with Gem Quality was breached in the first place or that Defendant acted to intentionally interfere with Plaintiff's contract. Plaintiff has not articulated sufficient facts or introduced

evidence to overcome Defendant's summary judgment motion. Therefore, there is no genuine dispute of material fact and Defendant is entitled to summary judgment on Plaintiff's claim for tortious interference with contractual relations.

**CONCLUSION**

For the reasons stated, Defendant's Motion for Summary Judgment, [DN 33], is **GRANTED**; and Plaintiff's Motion for Partial Summary Judgment, [DN 34], is **DENIED**. The Court will enter a separate Order and Judgment contemporaneous with this Memorandum Opinion.

**Thomas B. Russell, Senior Judge**
**United States District Court**

March 31, 2021

CC: Counsel of Record